INTERURBAN INVESTMENT CORPORATION

v.

RESOLUTION TRUST CORPORATION.

Civ. A. No. 93–2905.

United States District Court,
E.D. Louisiana.

Nov. 7, 1995.

Mike Donlon Pugh, Pugh & Boudreaux, Lafayette, LA, Harold B. Carter, Jr., Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, Michael Kellogg, Kellogg, Huber & Hansen, Washington, DC, for Interurban Inv. Corp.

David S. Rubin, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, LA, Rex M. Lamb, III, Robert P. Brown, Smith, Gambrell & Russell, Atlanta, GA, for Resolution Trust Corp.

Thomas Cloke, pro se.

Wayne Wandell, pro se.

Meyer H. Gertler, Gertler, Gertler & Vincent, New Orleans, LA, for Abatement Technologies, Inc.

## ORDER AND REASONS

JONES, District Judge.

Pending before the Court is the Resolution Trust Corporation's "Dispositive Motion for Summary Judgment," which was taken under submission on a previous date. Having reviewed the memoranda of the parties, the record and the applicable law, the Court DENIES the motion.

### Background

Interurban Investment Corporation (hereinafter "Interurban") filed this lawsuit alleging breach of contract by the Resolution Trust Corporation (hereinafter "RTC") for its failure to sell Interurban a series of promissory notes and related security instruments secured by a building in New Orleans know as Delta Towers (hereinafter "Delta Towers asset"). The following background for the purposes of this motion is taken from the undisputed material facts as agreed by the parties.[1]

In 1990 the RTC through Carol Glasgow entered into negotiations with ATI Property Trust, the purpose of which was to arrive at a contract for the RTC to sell the Delta Towers asset to ATI Property Trust, which was a trade name for a corporation named Abatement Technologies, Inc. (hereinafter "ATI"). The stock of ATI was owned as follows: Thomas Corish, 30 percent; James Gray, 20 percent, Thomas Cloke, 25 percent; and Wayne Wandell, 25 percent. Prior to ATI's liquidation, which began in August 1991,[2] its officers were: Corish, President; Gray, Vice–President; Cole, Treasurer; and Wandell, Secretary. Corish and Gray live in Atlanta. Cloke and Wandell lived in New orleans.

---

1. Cf. RTC's Statement of Undisputed Material Facts, attached to RTC's "Dispositive Motion for Summary Judgment" (R.Doc. 35) with Interurban's "Statement of Contested Material Facts and Response to RTC's Statement of Undisputed Material Facts," attached to its memorandum in opposition to RTC's motion (R.Doc. 54).

2. ATI's liquidation will be discussed at length infra.

In January 1991 ATI Property Trust submitted a written offer to the RTC to purchase the Delta Towers asset for $1.5 million.[3] The offer was signed by Gray as Vice–President on behalf of ATI Property Trust and by S.K. Pagna on behalf of Jerry Puckett, Field Site Manager for RTC. This agreement provided the following, in pertinent part, as to a "deposit" on the sale:

> **Deposit:** The deposit shall be the sum of $50,000 which shall be made immediately upon completion of the inspection period.... Said deposit is nonrefundable after escrow instructions are drawn unless agreed to by both Seller and Purchaser. Escrow instructions must be completed within thirty (30) days of the end of the forty-four (44) working days [sic] review as explained in Item # 6. (Emphasis in original.)[4]

Item 6 of the agreement allowed ATI Property Trust 44 working days after receipt of information it requested to review books and other records relative to the asset and provided that purchaser could terminate the agreement "without cost or penalty" during this time by advising "Seller" in writing. Item 6 also provides:

> During the 44 day [sic] review period and 30 day [sic] escrow instruction preparation Seller agrees to give purchaser right of first refusal for 72 hours after receipt of another offer to purchase the Note and Mortgage (Delta Towers Asset).
> Upon expiration of said days, if Purchaser has not given any indication of approval, such conditions shall be disapproved. The parties shall promptly execute closing/escrow instruction within thirty (30) days after Seller receives written approval from Purchaser.

The agreement also provided that it would be governed by the law of Georgia absent controlling federal law.

On July 24, 1991, RTC through Glasgow informed Gray, who was in Atlanta, and Cloke, who was in New Orleans, that a back-up offer was to be submitted. On the same date, Corish and Gray, purporting to act on behalf of ATI, assigned ATI's rights and obligations under the January 1991 contract with RTC to a Georgia corporation named the Bristol Corporation (hereinafter "Bristol"). One of the terms of the assignment provided that Bristol would provide the $50,000 necessary for the deposit under the RTC/ATI Property Trust agreement.

On the next day the Atlanta contingent of ATI, Corish and Gray, advised the New Orleans contingent, Cloke and Wandell, of the assignment, to which Cloke objected. Bristol learned of the objection and, in response, on July 26, Donald R. Harkelroad on behalf of Bristol sent Corish and Gray a letter, indicating that they had sought Bristol's concurrence in rescinding the agreement and that Bristol would accede to that request.[5] Corish declined the offer, stating that neither he nor Gray requested the rescission, informing Bristol that ATI wanted to continue the agreement with Bristol and stating that he desired to proceed to escrow because the RTC had received another offer and wanted to continue ATI's position.[6] Subsequently, RTC received notice that $50,000 in escrow funds had been delivered to an attorney named Tom Brown in Atlanta on behalf of ATI.[7]

In the meantime, Interurban entered into negotiations with Bristol to discuss a possible deal between those parties. At some point Corish and Gray also were involved in these negotiations.

Shortly thereafter, the RTC first learned of the assignment to Bristol, and a few days later RTC learned that the New Orleans

---

3. Exh. 2, attached to RTC's memorandum in support of motion for summary judgment (R.Doc. 35). Subsequent references to exhibits attached to RTC's memorandum will refer to the memorandum but not its record document number.

4. The agreement identifies First Federal Savings and Loan Association of Warner Robins, Georgia, as the seller, although RTC maintains that it became the holder of the Delta Towers asset through the closure and liquidation of First Federal. (Statement of Undisputed Material Facts No. 1, attached to RTC's motion.)

5. Exh. 5, RTC's memorandum in support.

6. Exh. 6, RTC's memorandum in support.

7. Exh. 9, RTC's memorandum in support.

contingent of ATI objected to the assignment to Bristol as an unauthorized corporate act.

The negotiations continued, this time between ATI's New Orleans group and Interurban. Then ATI's New Orleans contingent decided to liquidate ATI. Wandell and Cloke filed a Petition for Voluntary Liquidation on August 5, 1991, and on that same day the district judge appointed Cloke and Wandell temporary liquidators of ATI. ATI in liquidation next signed an agreement with Interurban to sell to Interurban ATI's rights under the January 1991 agreement with RTC.[8] Interurban acknowledged in this agreement that the "thirty (30) day due diligence period may not be available by virtue of the contract with RTC" and that "RTC has been notified by letter that the deposit required under its CONTRACT has been tendered, thereby requiring a thirty (30) day closing from that time."[9]

Cloke and Wandell also wrote to Corish and Gray and Bristol, repudiating any previous agreement between ATI and Bristol, and also to Brown and RTC, indicating Brown was not authorized to act as escrow agent for ATI.[10]

In response RTC advised Cloke in New Orleans that the $50,000 in escrow previously deposited by Atlanta ATI Group/Bristol was deemed improper because the escrow agent was contested by the New Orleans ATI contingent.[11] RTC further advised Cloke to deposit the $50,000 with its own lawyer in New Orleans, Sidney Cotlar.[12] Cloke than sent a $50,000 cashier's check to Cotlar.[13]

In mid-August Bristol filed suit against ATI in Cobb County, Georgia, and received a temporary restraining order enjoining ATI from selling the Delta Towers asset or from interfering with contractual relations with Bristol as to its assignment, and Bristol sent a copy of ATI's assignment to Bristol and the temporary restraining order to Cotlar, RTC's

attorney.[14] He responded by noting that the New Orleans contingent claimed it had already transferred the Delta Towers asset to Interurban, that the two different ATI contingents had a dispute and that he hoped the dispute could be resolved before the closing deadline of September 5, 1991.[15]

Interurban wrote to RTC indicating that it held a valid assignment, that it was prepared to go forward with closing but that it was willing to offer the RTC an extension for it to perform its obligations under the contract "so as to give RTC ample time to satisfy itself" that Interurban held the valid rights to acquire the Delta Towers asset.[16] Cotlar responded by writing to Interurban's counsel, indicating that the RTC "may" be willing to go forward with the closing with Interurban if Interurban and its principals individually would hold harmless, indemnify and defend RTC against any claims by Bristol, its officers, directors, shareholders or assigns.[17] Interurban declined.

On September 5 the Interurban principals and its attorney appeared at Cotlar's office. Following negotiations with Bristol's attorney, a 24-hour extension was granted on the closing. RTC then proposed that the closing be in escrow, but Interurban declined. On September 6, 1991, Bristol decided that it would pursue its claim at law in the form of damages against ATI, RTC and "others" and dissolved its temporary restraining order and claim for equitable relief.

At the meeting on September 6, 1991, between Cotlar and Interurban and its attorney, Cotlar presented a "Release, Hold Harmless and Indemnity Agreement" in favor of RTC, which Interurban refused to sign. RTC then granted an additional extension until close of business September 9 and then another extension until September 16 while the RTC investigated whether Interurban or Bristol held a valid assignment of the

8. Exh. 21, RTC's memorandum in support.

9. *Id.*

10. Exhs. 25, 26 and 27, RTC's memorandum in support.

11. Exh. 29, RTC's memorandum in support.

12. *Id.*

13. Exh. 30, RTC's memorandum in support.

14. Exh. 37, RTC's memorandum in support.

15. Exh. 38, RTC's memorandum in support.

16. Exh. 40, RTC's memorandum in support.

17. Exh. 41, RTC's memorandum in support.

contract between ATI d/b/a ATI Property Trust and RTC. The deadline was then extended until September 20 to allow for Interurban to consider a new RTC proposal in light of RTC's decision that it could not close with either Bristol or Interurban without a hold harmless agreement. The new proposal extended the closing for 60 days or until a court determined the rights of the parties, whichever occurred first, if Interurban made an additional deposit, agreed to pay interest on the purchase price while the judicial determination was pending and if ATI, Interurban and the Interurban principals gave RTC an indemnity against any claims by Bristol.

Interurban rejected that proposal, made a counteroffer and requested an extension until October 1, 1991, so the Louisiana court could hold a hearing on an involuntary liquidation of ATI. RTC agreed to an extension until October 2, 1991, of the closing deadline.

On September 30 Interurban submitted what Interurban witnesses referred to as a "tender" to RTC, consisting of two letters and a customer's draft drawn on First National Bank of Lafayette, Louisiana. The first letter stated that it tendered $1.5 million per the draft and authority to apply the $50,000 deposit to the purchase price. The second letter was denominated a "Letter of Instructions," which set forth certain items the RTC had to fulfill before it could negotiate the draft.

On October 1, 1991, the Louisiana Court found that the acts of Corish and Gray in attempting to transfer assets of ATI were *ultra vires* and entered a Judgment that provided, in pertinent part, that:

1) ATI be placed in involuntary dissolution;

2) Cloke and/or Wandell be designated as judicial liquidators of ATI vested with powers contained in LSA–R.S. 12:145;

3) all acts of Cloke and/or Wandell as temporary liquidators be affirmed and ratified, including specifically the assignment by ATI to Interurban of the ATI contract with RTC.

The RTC then extended the closing deadline again to October 11. Cotlar then wrote to Interurban on October 2, returning the September 30, 1991, tender as "unacceptable" and enclosing closing documents that included a hold harmless and indemnity agreement.[18] After a series of letters between Cotlar and Interurban's new attorney and further negotiations and extensions, RTC's attorney proposed three alternatives to Interurban's counsel on October 23:

1) the RTC could file an interpleader action to determine the rights of Interurban and Bristol if those parties would pay the maintenance costs and interest as of that date;

2) the RTC could close that day with Interurban if Interurban gave RTC a six-year, $1 million secured hold harmless; or

3) the RTC could consider the contract expired.

Further negotiations continued between RTC, Interurban and ATI and further extensions on the closing date were granted until November 1 at noon. When no closing occurred on November 1, Cotlar sent Interurban's counsel a letter by telefax and U.S. mail, informing him that the ATI contract with RTC had expired. There was one attempt to resurrect negotiations on November 5, but another RTC attorney, Robert Tucker, rejected this proposal.

In February 1993 RTC sold the Delta Towers asset to an unrelated third party. The instant lawsuit ensued.[19]

RTC makes several arguments in support of its motion for summary judgment, which can be summarized as follows. First, RTC claims that it was excused from performance because Interurban stands in the shoes of its assignor, ATI, which because of its actions in making two different assignments to separate parties, caused the situation that prevented RTC from closing. Second, RTC contends that is entitled to the equitable remedies relieving it from its obligation to perform the January 1991 contract, including

**18.** Exh. 63, RTC's memorandum in support.

**19.** Interurban's first lawsuit was dismissed for lack of subject matter jurisdiction due to Interurban's failure to exhaust administrative remedies. C.A. No. 92–1918 (E.D.La.) Subsequently, the instant lawsuit was filed.

but not limited to rescission of the contract with ATI, because of ATI's breach of its duties of fair dealing and good faith under the contract.

RTC's third argument is that it had an absolute right to rescind the contract or consider it expired as of September 5, 1991. Alternatively, as to this third position, RTC argues that it continued to reserve its right to claim a hold harmless/indemnity after September 5 through the remaining discussions and that it agreed to the extensions solely because of what it believed were good faith negotiations over the hold harmless/indemnity. Thus, it is entitled to summary judgment.

Fourth, RTC claims that Interurban never received a valid assignment under Louisiana and federal law which entitled it to purchase the Delta Towers asset from the RTC.

RTC's fifth argument is based on the proposition that RTC's duty to close in escrow on September 5, which was refused by Interurban, constituted a breach of the January 1991 contract by Interurban which relieved RTC of performance.

The final argument posited by RTC is that Interurban never made an effective tender to perform. As a result, RTC contends that under Georgia law it is entitled to summary judgment.

Interurban disputes each of RTC's arguments, relying on what it contends are disputed material facts as well as legal interpretations that Interurban believes prevent the granting of summary judgment.

### Law and Application

#### I. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ The non-movant's burden of showing a genuine issue of material fact "is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corporation,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*). Further, "factual controversies [are resolved] in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Id. See also Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (inferences drawn from the underlying facts must be viewed in a light most favorable to the nonmoving party).

■ In essence, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Finally, and quite obviously from Rule 56(c), the mover must be entitled to judgment as a matter of law.

With these principles in mind, the Court reviews each of RTC's arguments to determine if summary judgment is proper.

#### II. RTC Excused from Performance

■ RTC's first argument is that the dual assignment of the January 1991 contract by ATI's Georgia contingent to Bristol and by ATI's New Orleans contingent to Interurban violated ATI's duty of good faith and fair dealing in performance of the contract with RTC under Georgia law. *See West v. Koufman,* 259 Ga. 505, 384 S.E.2d 664 (1989).[20] RTC further contends that under Georgia law, an assignee can acquire no greater rights than that of the assignor and that the assignee takes the rights subject to any equities or defenses existing between the assignor and debtor at the time of the assignment and until notice of assignment is given. *See Healey v. Morgan,* 135 Ga.App. 915, 219

---

**20.** As noted, the January 1991 contract provided that Georgia law applied, absent controlling federal law.

S.E.2d 628 (1975). Because Interurban stands in the shoes of ATI, RTC contends that Interurban is subject to the defenses that RTC may have against ATI. RTC posits that the dual assignments prevented the RTC from closing, and, hence, it is entitled to summary judgment against Interurban as ATI's assignor.

In opposition, Interurban maintains that the assignment by the Atlanta contingent was unauthorized by ATI's articles of incorporation and by-laws and that Corish and Gray did not have apparent authority to transfer the January 1991 contract to the Bristol Corporation. Further, Cloke and Wandell acted in good faith and their actions were ratified by a Louisiana state court in a judgment of liquidation. As a result, Interurban argues that there are no defenses arising from the dual assignments which can be raised against Interurban.

■ RTC's argument fails for two reasons. First, it concedes that there are factual issues as to the authority of Corish and Gray to make the transfer to the Bristol Corporation. Despite this concession, RTC asserts that under Georgia law a corporation is vicariously liable for the wrongful acts of its officers committed in the prosecution of and within the scope of the corporation's business. There are two problems with this argument. First, RTC's argument is overbroad. Under Georgia law, "a corporation is ... vicariously liable for the *torts* of its agent that are committed within the prosecution of and within the scope of its business," not in general for "wrongful acts" as used by RTC. *Smith v. Hawks*, 182 Ga.App. 379, 355 S.E.2d 669, 675 (1987). Indeed, all of the cases cited by RTC involve alleged torts and do not involve a situation such as here where corporate officers with questionable authority assigned a contract to another corporation. *See, e.g., Fountain v. World Finance Corporation*, 144 Ga.App. 10, 240 S.E.2d 558 (1977). Second, and more importantly, RTC's contention is based on vicarious liability for acts of officers committed within the scope of the corporation's business. However, RTC concedes there is a question as to

whether Corish and Gray had the authority to make the assignment on behalf of ATI to Bristol Corporation. As such, even assuming that RTC's argument is not overbroad, there is a genuine issue of material fact as to whether Corish and Gray acted within the prosecution and scope of ATI's business.

The second reason that RTC's argument fails is that, as Interurban points out, a Louisiana court entered a judgment of liquidation ratifying the acts of Cloke and Wandell as temporary liquidators, which acts included the assignment of the January 1991 agreement to Interurban.[21] Absent a legal problem with this judgment, which has not been appealed, the Court refuses to find that RTC is excused from performance.[22]

Therefore, summary judgment is improper as to this issue.

III. Equitable Relief

■ RTC's second argument in support of its motion for summary judgment is that it is entitled to equitable relief, including but not limited to rescission of the January 1991 contract with ATI, because of the predicament in which it was placed due to the dual assignments. The RTC claims that it was innocent in creating that situation but that, in addition to ATI's role, Interurban took an active part in ATI's breach of duties and good faith and fair dealing under the January 1991 contract.

In support of its argument RTC relies on the following statement in the Restatement (Second) of Contracts § 339, which provides: "Where a claim adverse to that of an assignee subjects the obligor to substantial risk beyond that imposed on him by his contract, the obligor will be granted such relief as is equitable in the circumstances." RTC also relies on comment (a) to that section, which provides:

> An obligor who has contracted to render a performance should not be required to render it twice because of uncertainties of law and fact relating to the person entitled to receive it.... In most situations, the obli-

---

21. Exh. 62, attached to RTC's memorandum in support.

22. The Court discusses *infra* RTC's contention that this judgment is legally flawed and should not be recognized. As will be seen, the Court disagrees.

gor is protected against double liability by the rules permitting him to disregard an assignment until he receives notification of it and to honor it thereafter.... But additional safeguards may be needed when the obligor has received such notification and also has reason to know of an adverse claim.

In addition to the fact that RTC has not shown and the Court has been unable to ascertain whether Georgia has adopted this portion of the Restatement into its law, the Court finds that summary judgment is inappropriate for several reasons. First, and most obvious, is whether the claim adverse to that of the assignee, Interurban, by Bristol Corporation, subjected the obligor, RTC, "to a substantial risk beyond that imposed on him by his contract." In this case, as mentioned, a Louisiana state court in a judgment dated October 1, 1991, ratified the actions of Cloke and Wandell as temporary liquidators in assigning the contract to Interurban and also found that the actions of Corish and Gray in assigning the contract to Bristol Corporation were *ultra vires*.[23] The entry of this judgment, which was apparently never appealed, coupled with the facts that Bristol Corporation apparently never filed a lawsuit against RTC and that in September 1991 Bristol Corporation had lifted a temporary restraining order it had previously received against the sale going forward raises a question as to whether RTC was subjected to a substantial risk.[24]

Second, the Court also agrees with Interurban that the availability of an interpleader action to RTC at the time the dispute arose prevents the entry of summary judgment. Instead of filing an interpleader action, RTC chose to negotiate with Interurban in an attempt to close in escrow or to gain an indemnity agreement from Interurban. However, interpleader was available to RTC during the period at issue—August through October 1991—to determine which assignee rightfully held the right to buy the Delta Towers asset. The Court will not impose the additional equitable remedy of rescission at this late date when there is a question as to why RTC did not choose the equitable path of interpleader at the time the dual assignments took place.

RTC argues that interpleader is an improper remedy such that it could not have brought such an action. There are two problems with this contention, one factual and one legal. First, in October 1991 RTC's attorney proposed interpleader as one possible method of resolving the dispute over the dual assignments, according to RTC's undisputed facts.[25] Second, although RTC argues that federal interpleader would have been improper as to this "bilateral, executory sales contract,"[26] it offers no law specifically in support of such a statement. Indeed, comment d to § 339 of Restatement (Second) of Contracts, the section upon which RTC relies, specifically states that statutory interpleader under 28 U.S.C. § 1335 and interpleader under Fed.R.Civ.P. 22 are "appropriate remed[ies] for an obligor confronted by a claim adverse to that of an assignee."

▮ RTC also contends that both statutory interpleader and Rule 22 interpleader require deposit of fund or property into the registry of the court. However, Rule 22 interpleader by its very terms does not require a deposit. Fed.R.Civ.P. 22; *Murphy v. Travelers Ins. Co.*, 534 F.2d 1155, 1159 (5th Cir.1976).

▮ Finally, as to this issue, the Court addresses two other arguments raised by the

---

23. Exh. 62, attached to RTC's memorandum in support.

24. The Court acknowledges that Bristol Corporation threatened a lawsuit against RTC. RTC's Statement of Undisputed Material Facts, No. 84. However, neither Bristol's initial lawsuit filed in August 1991 nor its amended lawsuit in 1992 named RTC as a defendant, albeit the threat to the contrary. Exhs. 35 and 91, attached to RTC's memorandum in support. While this statement may seem to be hindsight by the Court, it must also be noted that RTC is asking that equitable remedies be imposed based on the facts through early November 1991, when it declared that the January 1991 agreement had expired. As of that time, Bristol had not followed through on its threat to sue RTC. Thus, the Court declines to impose equitable remedies, when, at the time RTC declared the agreement to be expired, Bristol had failed to file a lawsuit against RTC.

25. RTC's Statement of Undisputed Material Facts, No. 122.

26. RTC's reply memorandum, p. 9.

RTC. The first is RTC's offer to close in escrow. RTC claims that it pursued this equitable remedy but that Interurban rejected it such that, now, RTC's contract with ATI assigned to Interurban should be rescinded. In opposition, Interurban argues that the notes at issue would have been available for the escrow closing. In reply, RTC "begs to differ" but only states that the notes "could have been obtained, negotiated and delivered in short order...."[27] The Court finds there is a factual issue inherent in this statement which precludes summary judgment; that is, exactly what time period is meant by "short order?" RTC's second argument is whether Interurban's refusal to provide an indemnity agreement satisfactory to RTC leaves the Court only with the equitable remedy of rescission. However, because a good part of the negotiations between RTC and Interurban as to the indemnity agreement took place after the Louisiana state court ratified the ATI assignment to Interurban and declared the acts of Corish and Gray *ultra vires,* and because there is a question as to whether RTC was then put at substantial risk after that judgment was entered, the Court rejects the notion that it must impose rescission of the January 1991 agreement as a proper remedy.

## IV. RTC's Right to Rescind Contract

■ RTC's next argument revolves around the 30–day period within which to close the sale. RTC temporizes that the terms of the January 1991 contract provided that, after acceptance of the documentation and completion of the inspection period as evidenced by a $50,000 escrow deposit, there was a 30–day period within which to draw escrow instructions and close the sale. Because, as the undisputed facts show, RTC insisted that the original escrow deposit be placed with its own attorney, which was done on August 6, 1991, RTC contends that the 30–day period began to run that day, making the deadline September 5, 1991, for closing

under the contract. RTC further maintains that, because it only agreed to extend the deadline in order for Interurban to provide a hold harmless to RTC, which was never done, RTC had the right to rescind the contract as of November 1, 1991.

RTC relies on two legal propositions in support of its argument. The first proposition is that time was of the essence in this contract. In support RTC cites *North Fulton Realty Company v. Kane,* 105 Ga.App. 274, 124 S.E.2d 405, 408 (1962), where the court found that "time was of the essence of the contract" because it provided that closing would occur within 120 days of acceptance of the contract. Thus, RTC contends that the 30–day deadline in the January 1991 contract within which to close the sale constitutes a clause establishing that time was of the essence.

RTC relies upon *Development Corporation of Georgia, Inc. v. West,* 116 Ga.App. 768, 159 S.E.2d 94 (1967) for its second proposition, *i.e.,* that a party may give the opposing party notice that the first party will consider the contract rescinded unless performance occurs within a specified time and that, assuming performance does not occur within the specified time, which was reasonable, the second party will be deemed to have consented to a rescission of the contract.

■ As to the first proposition, however, the Court finds that, notwithstanding the holding of the court in *North Fulton Realty,* the law in Georgia as stated by the Georgia Supreme Court is that "[w]here a contract of sale does not expressly stipulate that time is of the essence, the mere prescribing of a certain time within which the transaction shall be closed does not necessitate a tender of the purchase price within that time." *Belk v. Nance,* 232 Ga. 264, 206 S.E.2d 449, 452 (1974).[28] *See also Pollard v. Martin,* 191 Ga.App. 681, 382 S.E.2d 720, 721 (1989). Here, because RTC depends solely on the

27. RTC's reply memorandum, p. 14.

28. The Georgia Supreme Court further explained:
However, 'the delay must not be wilful, must not be unreasonably long, and must not have occasioned damage which will not admit of compensation. And where there has been a

failure to comply with the time stipulated, the other party may, by notice, fix upon and assign a reasonable time for completing the contract, and may call upon the party in default to do the act to be done by him within this period.' *Id.,* quoting *Ellis v. Bryant,* 120 Ga. 890, 48 S.E. 352, 354 (1904).

**1360**

language of the contract prescribing the time within which closure must occur and not any other express language in the contract,[29] the Court finds that, pursuant to *Belk*, time was not of the essence in this contract.

Moreover, even assuming that time was of essence in this contract, "timely performance may be waived orally as shown by conduct before or after the closing," and such waiver is an issue for the trier of fact. *McCullough v. McCullough*, 263 Ga. 794, 439 S.E.2d 486 (1994). *See also Smothers v. Nelson*, 246 Ga. 216, 271 S.E.2d 137, 138 (1980). Certainly, there is a question of fact raised as to whether RTC waived timely performance through its extensions to November 1, 1991, and, possibly, even beyond that date. This last factual question arises from a memorandum produced by defendants from Wanda Lee, an asset specialist, written in February 1993 which states that the deadline for execution of the January 1991 sale agreement, which had been assigned to Interurban, had been extended through December 1, 1991.[30]

RTC argues that this extension is irrelevant because it refers to internal "case" authority for RTC internal purposes, but RTC fails to support this statement in any fashion. As such, the Court finds that there is a genuine issue of material fact as to whether or not there was an extension until December 1, 1991, to close the sale in question.

Additionally, there are at least two other genuine issues of material fact which prevent summary judgment on this issue, even assuming that the RTC set November 1 as the "drop dead" date for closure pursuant to the principles of *Development Corporation of Georgia*. First, as the Supreme Court of Georgia stated, "mere prescribing of a certain time within which the transaction shall be closed does not necessitate a tender of the purchase price within that time" as long as

the delay is not unreasonably long or willful. *Belk*, 206 S.E.2d at 452. In this case RTC's Statement of Undisputed Material Facts shows that just one day after Interurban received a letter from RTC's attorney indicating that the January 1991 contract had expired, Interurban offered to purchase the property under the same terms and conditions RTC had been seeking.[31] While there had been a delay from September 5 to early November, the Court also notes that during this time period RTC's attorneys worked with attorneys as to the liquidation of ATI and the wording of the indemnity agreement, as will be explained further *infra*. Hence, there is at the least a question of fact as to whether the delay was unreasonably long or willful under *Belk*.

Finally, the Court finds that there is a genuine issue of material fact as to whether a further delay in closing from November 1 to November 6 under RTC's own terms was willful on the part of Interurban or unreasonably long under *Belk*.

Therefore, because there are questions of fact based on Georgia law, summary judgment is inappropriate on this issue.

## V. Interurban Did Not Receive Valid Assignment

The RTC contends that the August 5, 1991, assignment from ATI to Interurban of the January 1991 contract was invalid under Louisiana law and that the state court judgment liquidating ATI can not be recognized because notice and an opportunity to be heard was not provided to Corish and Gray, the RTC or Bristol, who were interested parties.

RTC first argues that the powers granted to Cloke and Wandell as temporary liquidators under LSA–R.S. 12:145.C. were not authorized by any statute.[32] In an invol-

---

**29.** The Court notes that Item 11 of the January 1991 agreement states that "[t]ime is of the essence with respect to the acceptance of this offer...." (Exh. 2, RTC's memorandum in support.) Quite obviously, this language limits time as being of essence to acceptance of the offer and does not apply to the closing.

**30.** Exh. III, attached to plaintiff's memorandum in opposition. (Although plaintiff identifies its exhibits with Roman numerals in its memoran-

dum, the actual exhibits are tabbed with Arabic numerals.) Although this exhibit is not verified in any way, the Court notes that RTC does not contest its authenticity, only its interpretation, as explained *infra*.

**31.** RTC's Statement of Undisputed Material Facts, Nos. 135–37, pp. 62–64, which are uncontroverted by Interurban.

**32.** Exh. 23, RTC's memorandum in support.

untary dissolution, a Louisiana court may *ex parte* appoint a "temporary liquidator" pending trial of a corporate dissolution and may appoint a judicial liquidator after trial. LSA–R.S. 12:143.E. The powers of a judicial liquidator are set forth at LSA–R.S. 12:146.-C., and according to that statute a court may also grant a judicial liquidator such powers as provided to a liquidator in a voluntary dissolution under LSA–R.S. 12:145.C. RTC argues that the order of the state court giving Cloke and Wandell powers as temporary liquidators under LSA–R.S. 12:145.C. was faulty because there is no statute by which a court can grant "temporary liquidators" plenary powers, including powers in general to conduct business affairs, under LSA–R.S. 12:145.C. Instead, RTC contends that Louisiana only provides that judicial liquidators appointed after trial can be given the plenary powers under LSA–R.S. 12:145.C. As a result, RTC contends that this Court should not give the state court's order or its ultimate judgment full faith and credit under the Constitution.

To the contrary, Interurban partly relies on *Waguespack, Dupree & Felts, Inc. v. Urban Redevelopments, Inc.*, 383 So.2d 448 (La. App. 4th Cir.1980) for the proposition that a temporary liquidator can be given the powers enumerated under LSA–R.S. 12:145.C. There the plaintiff appealed from a judgment denying its claim arising out of a contract to appraise property, which contract was signed by a "temporary liquidator." *Id.* at 449. Plaintiff argued that because the temporary liquidator was appointed "with all the duties and powers provided by law," these duties included the powers under LSA–R.S. 12:145.C. to carry on the business of the corporation and to do all necessary to liquidate the corporation. *Id.* at 450. The court of appeal rejected this argument, embracing the trial court's interpretation that the general vesting of power "with all the duties and powers provided by law" only provided the temporary liquidator with power enumerated under LSA–R.S. 12:146, which does not include entering into contracts. *Id.* The trial court (and the court of appeal) found that, although § 146 provides that "a Court MAY

include any or all powers enumerated in Section 145 (the section dealing with out of court dissolutions)," no such order existed. *Id.* at 451. Hence, the temporary liquidator lacked the legal authority to enter into the contract. *Id.*

In the present case, unlike *Waguespack*, a specific order giving the temporary liquidators Cloke and Wandell powers under § 145.C. does exist. Further, the court of appeal in *Waguespack* certainly gave implicit approval, if not explicit approval, to the proposition that a district court can give temporary liquidators powers under § 145.C.

RTC also argues that this approval, if it exists, is only *dicta.* The Court is unpersuaded and finds that the foundation of this argument founders. A review of the court of appeal's decision reveals that the discussion of whether a temporary liquidator can be given powers under § 145.C. is part of the reasoning of the decision, not dicta.

■ Turning to the issue raised by RTC as to whether notice was given to the interested parties, the Court finds that there exist genuine issues of material fact as to whether Corish and Gray, Bristol and RTC received notice of the order appointing Cloke and Wandell temporary liquidators and of liquidation proceeding and/or that Cloke and Wandell had been divested of power as to ATI. On August 5, 1991, shortly after being appointed temporary liquidators, Cloke and Wandell sent a letter to Corish and Gray notifying them of the court's appointment of Cloke and Wandell as temporary liquidators and enclosing a copy of the order.[33] On the same date Cloke and Wandell sent a similar letter to Harkelroad of the Bristol Corporation, stating that Corish and Gray no longer had any authority to act on behalf of ATI, although this letter did not include a copy of the court's order.[34] Bristol admitted, however, that it knew of the liquidation in its letter to Cotlar enclosing a copy of the temporary restraining order.[35]

As to specific notice to Corish and Gray about the liquidation proceeding and dates set for hearing, Cloke and Wandell's attorney

**33.** Exh. 25, RTC's memorandum in support.

**34.** Exh. 26, RTC's memorandum in support.

**35.** Exh. 37, RTC's memorandum in support.

testified at the hearing on the liquidation that he had sent notice twice.[36] The first notice was sent via certified mail on or about August 8, 1991, and the return receipts were returned to the attorney but misplaced in his office.[37] The hearing originally scheduled for September 5, 1995, was then continued, and new notice was sent via certified mail on September 17, 1995, for the hearing on October 1, 1995.[38] The return receipts for this second notice were introduced into evidence at the liquidation hearing.[39]

Finally, RTC concedes that it knew of the liquidation proceeding because prior to the hearing its attorneys took part in drafting a proposed judgment to be rendered at the hearing.[40]

These genuine issues of material fact as to notice, coupled with the Court's finding that a Louisiana court could appoint a temporary liquidator with powers under LSA–R.S. 12:145, preclude summary judgment on this issue. Considering the record, the Court is inclined to give full faith and credit to the judgment of liquidation entered in state court.

## VI. Interurban's Ineffective Tenders

■ RTC's final argument is that the tenders that Interurban contends it made on September 5, 6 and 30, 1991, are legally ineffective under Georgia law.

On September 5, Interurban appeared at the closing scheduled for that day with $1,085,000 in cashier's checks made payable to one of its principals, third-party checks from a discount brokerage in the amount of $143,718.95 made payable to the same principal, a draft drawn by that principal on an unnamed money-market account in the amount of $15,000 and an assertion that Interurban could apply an outstanding and unpaid flood insurance claim estimated to be $212,000 to the purchase price.[41]

RTC argues that, putting aside whether Interurban could apply the unpaid flood insurance claim to the sale price,[42] under Georgia law RTC had no obligation to accept third-party checks or to accept a personal draft that did not have a printed account number on it. In support, RTC cites several Georgia cases. The Court finds that the first case, *Buffington v. Sigler,* 259 Ga. 478, 383 S.E.2d 876 (1989), is factually inapposite because the sale there involved a sale pursuant to OCGA § 9–13–166, which provides that the form of tender at a judicial sale can be cash, cashier's check or certified check drawn on a federally insured institution. *Buffington,* 383 S.E.2d at 876–77.

RTC also relies on *Hall v. Heard,* 223 Ga. 659, 157 S.E.2d 445 (1967) for the proposition that uncertified, third-party checks do not constitute a valid tender in any case. In *Hall* the Georgia Supreme Court rejected as an invalid tender a check allegedly authorized by a bank official in contemplation of a loan to be made subsequently to the purchaser, a draft drawn by the purchaser on his sister and a third-party check to purchaser from lease proceeds. *Id.* 157 S.E.2d at 447. The Georgia Supreme Court did not make a blanket statement that such tenders are always invalid, however. Nevertheless, the Court finds that, even if *Hall* stands for the proposition that such tenders are never valid, there is a genuine issue of material fact in this case as to whether the parties agreed that a different tender would be acceptable.

In his deposition, Dr. David P. Eugster, an Interurban principal, was asked his under-

---

36. Exh. N, pp. 48–49, RTC's memorandum in support.

37. *Id.*

38. *Id.*

39. *Id.*

40. RTC reply brief, p. 22, n. 32.

41. RTC's Statement of Undisputed Material Facts, No. 73, to which Interurban effectively does not object.

42. In its motion RTC "pretermits" the issue of whether Interurban could apply the flood insurance claim to the purchase price, but, even assuming this an issue, Interurban raises a genuine issue of fact as to the use of the insurance proceeds to pay the balance of the purchase price. In his deposition, Dr. David P. Eugster, one of Interurban's principals, testified that RTC representative Carol Glasgow told Interurban that they could apply the insurance claim to the purchase price. (Deposition of Dr. David P. Eugster, pp. 58–59, attached to RTC's motion for summary judgment as Exh. D.) Thus, the only question is whether the other monetary instruments were proper.

standing as to whether the RTC required certified funds at the September 5 closing. He mused as follows:

> We had gotten a letter from [RTC's attorney] ... on August 29 saying that they requested certified funds. We called him and asked [RTC representative] Carol Glasgow ... what exactly was meant by that, and she stated that we would have available at the closing an insurance claim which was somewhat over $200,000 that we could apply towards that contract.... And he said, "Do the best you can as far as getting cash." He said, "We request it." And it was never demanded.[43]

The Court finds that this constitutes a genuine issue of material fact as to whether RTC was willing to accept a tender other than cash or certified funds at the September 5, 1991, closing.[44]

■ As to the September 6th closing, RTC argues that, although Interurban appeared at the closing with $1.45 million in cashier's checks, the tender was ineffective because "it was coupled with an unreasonable refusal to sign the prepared closing documents despite an offer made by Interurban the previous day to provide a hold harmless to induce RTC to a closing" and despite a threatened lawsuit by the Bristol Corporation that same day.[45]

By contrast, Interurban argues that its tender on September 6 was proper and that the RTC's addition of a hold harmless relieved Interurban of any obligation to make a tender, relying on *Nickelson v. Owenby*, 208 Ga. 352, 66 S.E.2d 828 (1951).

In *Nickelson*, the Georgia Supreme Court faced the issue of whether, on the basis of the pleadings, plaintiff had stated a cause of action. *Id.* 66 S.E.2d at 828–29. The Georgia Supreme Court stated:

Admitting the allegations to be true, ... no tender was necessary. 'A tender is not required where the party to whom the offer is made states that the tender would be refused if made.' We construe the statement of the defendant, that 'he would not sell at the price stipulated in said contract,' to be the equivalent of a statement that the tender would be refused if made. If [sic] follows from what has been said above, the judgment of the court below [overruling defendant's demurrer] was not error.

*Id.* at 829 (citations omitted). In this case, the RTC concedes that Interurban's monetary tender was sufficient but argues that it was unreasonable for Interurban not to sign the Hold Harmless and Indemnity Agreement prepared by RTC's attorney after negotiation. However, the Court has not been presented with any language as to the disputed hold harmless and indemnity agreements to indicate whether, notwithstanding that a hold harmless agreement was not a necessary condition of the January 1991 document, the proposed language as drafted by RTC was reasonable. Thus, this issue is not ripe for summary judgment and will be denied.

Moreover, the Court notes that the RTC consented to a postponement of the closing on September 6, which raises a genuine issue of material fact as to whether the alleged ineffectiveness of the September 6th tender is even an issue.

Finally, RTC argues that Interurban's September 30th tender was invalid because it consisted of an unsigned "Customer's Draft" and two letters that included a "Letter of Instructions" containing numerous "steps" that RTC was required to fulfill before negotiating the Customer's Draft.[46] RTC argues

---

**43.** Deposition of Dr. David P. Eugster, pp. 58–59, attached as Exh. D to RTC's memorandum in support.

**44.** Although Interurban does not specifically rely on this deposition testimony for this point in its opposition memorandum, on a motion for summary judgment, the Court is not limited to consideration of deposition testimony singled out by a party. *Higgenbotham v. Ochsner Foundation Hospital*, 607 F.2d 653, 656 (5th Cir.1979) (Fed. R.Civ.P. 56 "does not distinguish between depo-

sitions merely filed and those singled out by counsel for special attention"). *See also Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410–411 (5th Cir.1980) ("Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention the court must consider before granting summary judgment.")

**45.** RTC's memorandum in support, pp. 31–32.

**46.** RTC's memorandum in support, p. 32.

that the instructions actually constituted additional requirements placed on RTC beyond the requirements of the January 1991 contract. Interurban counters that the "Letter of Instructions" requires nothing beyond the January 1991 contract.

The Court first examines the contract itself, the "Letter of Instructions" and then the applicable law in order to sort out the parties' contentions. In the January 1991 contract, Paragraphs 4 and 5 are directly applicable. These provide, in pertinent part:

> 4. **Seller's Representations:** The Seller represents and warrants that it is and will be duly and legally authorized and permitted to enter into this agreement and to carry out [sic] and that its right to execute this agreement is not limited by the existence of any other contracts or agreements whatsoever. Otherwise, Seller does not make any representations and warranties, and the sale and assignment will be without recourse.
>
> Seller will disclose its knowledge of existing, pending or proposed violations of any codes or building ordinances and any defects within the premises which would render them unsuitable for their present use and any condemnation proceedings in process or proposed which would affect the property.
>
> The Purchaser acknowledges that the real estate securing the Note and Mortgage has asbestos as indicated in a report provided by the Seller dated November 29, 1989 [sic] prepared by P.C.I., Inc. [sic] and that the Seller assumes no liability for the contents of or omissions in the P.C.I. report.
>
> Seller will disclose its knowledge of all liens, encumbrances and defects in title, restrictions and easement, if any, other than those discussed within this offer.
>
>          \*      \*      \*
>
> 5. **Seller's Delivery:** Within five (5) days of the date of execution of this agreement, the Seller will make available to the Purchaser ... the following:

> A.) All legal documents, correspondence and agreements relating to the subject property (Delta Towers);
>
> B.) A copy of the tax assessment and tax bills with respect to the premises for the past two (2) years....
>
> C.) Copies of all fire, extended risk, liability and other insurance policies covering the premises and a schedule of the premiums therefore;
>
> D.) Any other documents or information which may be reasonably requested by the purchaser from time to time.[47]

The January 1991 contract also provided at paragraph 6 that "[f]or a period of forty-four (44) working days after the receipt of all information requested by the Purchaser, the Purchaser shall have the right to inspect the premises, to examine all of the books and financial and other records of the Seller applicable to the premises and to review all items which the Seller agrees to provide or make available to the Purchaser."

The "Letter of Instructions" sought items in four categories and provided instructions. The first category of information requested any information as to violations of codes or building ordinances, defects in the premises which would make it unsuitable for present use, condemnation proceedings which would affect the property, and "representation of title," including "a recital of all liens, encumbrances, defects of title, restrictions and easements, other than those mentioned in the said January 18, 1991 contract."[48] The second category sought information "in a form satisfactory to Interurban" a Collateral Real and Chattel Mortgage Note in the amount of $37,000,000 between the Seller and Delta Towers, Ltd., properly endorsed, the unpaid balance of which was almost $37,000,000 plus accrued interest since 1984 which "[t]he purchaser understands ... are in default but not prescribed."[49] The second category also sought Collateral Real and Chattel Mortgage and Assignment of Leases as to the Delta Towers Property.[50] Further, as to this sec-

---

47. Exh. 2, attached to RTC's memorandum in support (emphasis in original).

48. Exh. 61, p. 1, attached to RTC's memorandum in support.

49. *Id.,* pp. 1–2.

50. *Id.,* p. 2.

ond category, the "Letter of Instructions" requested that, if the originals of the collateral real and chattel mortgages and assignment of leases had been filed in the foreclosure proceeding in Louisiana state court, certified copies of the documents be provided.

The second category of the "Letter of Instructions" also sought: a motion and order executed by RTC substituting Interurban as plaintiff in the foreclosure suit in state court; an executed assignment of other notes in the amount of $2,700,000 from RTC to Interurban referred to as the "Borg–Warner Notes"; an executed Assignment of Loan Agreement and Pledge together with Promissory Note in the amount of $3,700,000 and Collateral Mortgage Note each dated September 1, 1983, from RTC to Interurban and referred to as the "Delta Towers Notes"; copies of insurance policies and claims filed or pending and escrowed payments for damages; all documents relating to the Delta Towers property; and a copy of property tax assessment and bills for the Delta Towers property for the past two years.[51]

The third category requested "evidence of authority for the person signing on behalf of the RTC."[52] The fourth category of information sought in the "Letter of Instructions" was "evidence of authority of RTC to transfer the items set forth in the second category on behalf of First Federal Savings & Loan of Warner Robins, Georgia.[53]

The "Letter of Instructions" then stated that all of the information sought should be enclosed in the draft envelope attached and returned to The First National Bank of Lafayette, Lafayette, Louisiana.[54] The further letter stated that upon receipt of the $1,450,-000 draft from The First National Bank, the $50,000 previously escrowed should be applied to the purchase price for full consideration of $1,500,000.[55] Attached to the RTC's exhibit for the "Letter of Instructions" is a copy of the Customer's Draft, unsigned, to

pay to RTC on or before October 30, 1991, $1,450,000 "[a]s per instructions in letter from Interurban Investments [sic] Corporation dated September 30, 1991."[56]

■■■ RTC first contends that the "Customer's Draft" was an invalid tender as not being cash, certified funds or a cashier's check. In support, RTC again relies on *Buffington, supra,* which is inapposite for the reasons previously stated. RTC also contends that the "Customer's Draft" in its possession is not signed and that neither Dr. Eugster nor another of Interurban's principals, Artie Fletcher, can recall whether the original was signed. Therefore, the draft was invalid. However, there is a genuine issue of material fact as to whether RTC waived this requirement and agreed to accept this unsigned Customer's Draft, even assuming it was unsigned,[57] until the documents and information requested by Interurban were forwarded to the bank. This question of fact arises because in neither of the two letters sent by Cotlar, RTC's attorney, to Interurban or its attorney discussing the September 30th tender did Cotlar mention that there was a problem with the draft being unsigned, even though in one of the letters the RTC attorney details why the tender was returned.[58] Construing the inferences from this noticeable absence in favor of Interurban, the Court finds that RTC has failed to show that there is no genuine issue of material fact as to this point. Hence, summary judgment is inappropriate.

■■■ RTC next contends that the September 30th tender was invalid because it sought "representation of title" not required by the January 1991 contract. RTC postulates that the January 1991 contract only requires that it warrant that it was authorized to and permitted to enter into the January contract and to carry it out. Thus, "[t]he January

---

51. *Id.,* pp. 2–3.

52. *Id.,* p. 4.

53. *Id.,* p. 3.

54. *Id.,* p. 3.

55. *Id.,* p. 4.

56. *Id,* attachment.

57. The original customer's draft was returned to Interurban by RTC's counsel in a letter dated October 2, 1991. Exh. 63, attached to RTC's memorandum in support. The parties are apparently unable to produce the original.

58. Exhs. 63 and 65, attached to RTC's memorandum in support.

[1991] contract was essentially non-recourse, in the nature of a quit-claim [sic]." [59]

Under Georgia law a "tender must be certain and unconditional, except for a receipt in full or delivery of the obligation...." OCGA § 13–4–24. *See Adcock v. Sutton*, 224 Ga. 505, 162 S.E.2d 732, 734 (1968) (similarly construing Georgia predecessor statute, § 20–1105). Interurban contends that this request (and the others) fall within the second exception, *i.e.*, that Interurban was seeking delivery of the obligation owed.

The specific property to be purchased in the January 1991 agreement was a Collateral Real and Chattel Mortgage Note and a Collateral Real and Chattel Mortgage and Assignment of Leases, but in the description of the property in the agreement there is a reference to the property at issue, the Delta Towers asset, used to secured the indebtedness.[60] The contract also provides that RTC "will disclose its knowledge of all liens, encumbrances and *defects in title*, restrictions and easement [sic], if any, other than those discussed within this offer." [61] Quite obviously, this can only be a reference to the Delta Towers asset, even though the property to be sold was the mortgage, note and assignment of leases. In the face of this language, the Court finds that summary judgment is improper because there is an obvious question of fact whether such a request fell outside the requirements of the 1991 contract.

■ RTC also posits that the portion of the "Letter of Instructions" which states that "[t]he purchaser understands that the Note and Collateral Real and Chattel Mortgage are in default, but not prescribed" constitutes an unreasonable requirement that RTC warrant something it had not agreed to. Howev-

er, as noted, under Georgia law there are two exceptions for unconditional tender: "receipt in full or delivery of the obligation." OCGA § 13–4–24. The Court concludes that, on the basis of the record before it, Interurban's request is not unreasonable in that it relates to "delivery of the obligation," *i.e.*, if the obligation—the note, mortgage and assignment are prescribed—then the obligation itself might not exist. Despite RTC's argument that Interurban was requesting RTC to warrant more than just a "quitclaim" sale, the Court finds that the request is reasonable on the present record because, otherwise, Interurban might be paying $1.5 million for a worthless obligation. Thus, summary judgment must fail due to the lack of facts before the Court.[62]

■ RTC's next two contentions as to the September 30th tender are related. RTC maintains that the tender's request for an executed motion for substitution of counsel in the foreclosure proceeding and an assignment of the Borg–Warner notes are requirements outside of the January 1991 contract. The Court finds two fatal flaws in this argument. First, the letter from RTC's attorney to Interurban principal Artie Fletcher on October 2, 1991, includes copies of the assignment of the Borg–Warner notes "combin[ing] the assignment documents and the hold harmless documents previously reviewed by your attorney." [63] As with the allegedly unsigned Customer's Draft, the Court finds that the RTC attorney's failure to mention the assignment of the Borg–Warner notes as a problem while specifically discussing them creates a genuine issue of material fact that precludes summary judgment. Indeed, it ap-

---

59. RTC's memorandum in support, pp. 33–34.

60. Exh. 2, pp. 1–2, attached to RTC's memorandum in support.

61. *Id.*, p. 3 (emphasis added).

62. The Court emphasizes that this ruling is made on the basis of the present record for the purposes of the instant motion. This ruling does not constitute a definitive ruling that bars the introduction of evidence such that Interurban's request is unreasonable. As an illuminating exam-

ple, and only by way of example, there is no evidence before the Court to indicate whether the risk of the obligation being prescribed was taken into account in negotiating the purchase price. At the same time, the Court does not mean to suggest that such evidence might provide a basis for summary judgment or that the Court invites a further motion on the basis of such evidence. The example is used purely for illustrative purposes.

63. Exh. 63, attached to RTC's memorandum in support.

pears from this letter that the RTC attorney agrees to such an assignment but ties it to the hold harmless agreement. Summary judgment is clearly unwarranted.

The second problem is that the RTC concedes, consistent with the October 2 letter at least in regard to the Borg–Warner notes, that it would sign a motion to substitute counsel in the foreclosure proceeding and would assign the Borg–Warner notes "*if* a closing occurred."[64] The Court declines to find that Interurban's September 30th tender was invalid on the basis that RTC agreed to provide the executed motion and assignment but only in the temporal order that it desired. There is nothing in the record to support such a contention,[65] so summary judgment is inappropriate. RTC has failed to establish a lack of a genuine issue of material fact.

■ RTC's final argument as to this issue is that the "Letter of Instructions" included a requirement that RTC provide due diligence items—some of which RTC concedes are included in the January 1991 contract—but that "[t]he 'inspection period' had long since expired, and many if not all of the listed items had already been provided by the RTC to ATI or Interurban or both."[66] RTC contends that the tender was invalid because Interurban had no right to force RTC to continue to provide due diligence items "at that late date."[67] RTC's Statement of Undisputed Material Facts reveals that, as to due diligence items included in the January 1991 contract, RTC is referring to items in the second category of information requested by Interurban in the "Letter of Instructions," specifically information as to insurance policies on the Delta Towers property and a schedule of premiums for those policies; legal documents, correspondence and agreements relating to the property; and property tax assessments and tax bills for the property.[68] As to due diligence items not listed in the January 1991 contract, RTC is referring to Interurban's request in the second category of information for a schedule of insurance claims filed or pending or payments for damages that had been escrowed.[69]

The Court finds that neither the requests for prior information already given to ATI, Interurban or both or for new information renders the September 30th tender invalid or entitles RTC to summary judgment. The fact that the information may have been previously provided only required such a response from RTC to that effect and does not invalidate Interurban's tender. Assuming *arguendo* that RTC had previously provided the information, the Court will not invalidate Interurban's tender on the basis of an apparent oversight that the information had been given to ATI, Interurban or both. As to RTC's argument that it should not have been required to provide information not previously requested, the October 2, 1991, letter from Cotlar to Fletcher belies this contention because it states that "[i]tems identified as 2F, G, H, and I, ... to the extent they are included in the purchase agreement dated January 18, 1991, have been provided to ATI in accordance with Paragraph 5 of said agreement."[70] The information that RTC contends was not included in the January 1991 agreement is Item 2(G). *See* n. 69, *supra.* Hence, construing the inferences

---

64. RTC's memorandum in support, pp. 34 and 35 (emphasis in original).

65. The Court also notes that in neither Cotlar's letters to Fletcher on October 2, 1991, nor his letter to Interurban's attorney six days later does Cotlar mention that the time when the motion and assignment are to be given to Interurban is a factor in return of the tender. (Exhs. 63 and 65, RTC's memorandum in support.)

66. RTC's memorandum in support, p. 35.

67. *Id.*

68. RTC's Statement of Undisputed Material Facts, No. 106 and n. 141, attached to RTC's motion, referring to items 2(F), 2(G), 2(H) and 2(I) in the "Letter of Instructions."

69. RTC's Statement of Undisputed Material Facts, No. 107 and n. 142, attached to RTC's motion for summary judgment, referring to Item 2(G) in the "Letter of Instructions."

70. Exh. 63, p. 3, attached to RTC's memorandum in support.

from the October 2nd letter in favor of Interurban, as this Court must, the Court finds that the letter indicates that some, if not all, of the information requested in Item 2(G) was previously included in the January 1991 contract. This creates a genuine issue of material fact as to whether the due diligence item for information as to insurance claims or payments for damages was something included in the January 1991 contract. Moreover, because it appears from the record, as explained above, that the RTC was going to allow Interurban to use the proceeds from a flood damage claim as part of the payment of the purchase price,[71] there is a genuine issue of material fact as to whether Interurban was entitled to information as to any other "insurance claims filed or pending or escrowed payments for damages."[72] Such a determination is better left for the trier of fact. *Anderson, supra.*

### Conclusion

The Court has examined each and every point raised by RTC in support of its "Dispositive Motion for Summary Judgment." Numerous genuine issues of material fact coupled with various legal issues preclude the granting of this motion, as exhaustively enunciated herein.

Accordingly,

IT IS ORDERED that the "Dispositive Motion for Summary Judgment" filed by Resolution Trust Corporation is DENIED.

---

**71.** Deposition of Dr. David P. Eugster, Exh. D, pp. 58–59, attached to RTC's memorandum in opposition.

**72.** "Letter of Instructions," Exh. 61, Item 2)G), p. 3. attached to RTC's memorandum in support.